## DENECHAUD ET AL. vs. BERREY.

[BILL IN EQUITY BY MARRIED WOMAN TO HAVE NOTE EXECUTED BY HER AND
HER HUSBAND, AND SECURED BY MORTGAGE ON HER SEPARATE STATUTORY ES-
TATE, AND SALE OF MORTGAGED PREMISES, SET ASIDE, &C,]

1. *Statutory separate estate; what words of conveyance create.*—A deed made
August 12th, 1865, conveying to a married woman in this State lands sit-
uated here, "for her sole and separate use and benefit," create in her a
statutory separate estate, governed by all the restrictions and limitations
contained in the Revised Code for the regulation of the "separate estate
of the wife."

2. *Same; effect of words "for sole and separate use," &c.*—The words "for
her sole and separate use and benefit," contained in such a deed, do not
change the character of the estate which the married woman takes thereby.
By force of the provisions of the Code, that would be the legal effect of
the deed, although it contained no such words.

3. *Same; married woman can not mortgage, &c.*—An estate so created, is not
subject to be encumbered by the wife's mortgage, as at common law, to
secure her own or her husband's debt contracted after the Code went into
effect.

4. *Same; principles applied in case at bar.*—In the case at bar, this court
affirmed a decree, ordering a note made by husband and wife for à loan
of money, secured by mortgage on what was held to be the wife's separ-
ate statutory estate, to be given up for cancellation, &c,, and setting aside
and cancelling a sale and conveyance of the mortgaged premises under
the power of sale, and decreeing an account against purchaser at such
sale for rents, &c., and restoring possession of mortgaged property sold.

APPEAL from the Chancery Court of Mobile.
Heard before Hon. ADAM C. FELDER,

The bill in the present case was filed May 3d, 1869, the
facts of which may be stated as follows: Complainant, Eli-
za L. Berrey, in 1849, intermarried with John Berrey, in
this State, every since which time they have resided here.

On the 12th day of August, 1865, she received a war-
ranty deed in fee from one Herbert to a house and lot in.
Mobile county. The consideration expressed in said deed
is four thousand dollars, paid said Herbert by complainant;

and the bill also alleges that the property was paid for by her brother and given to complainant. The *habendum* clause of the deed was as follows: " *To have and to hold* the above described premises, with all improvements thereon, to the said Eliza L. Berrey for her sole and separate use and benefit forever."

In the year 1867, complainant and her husband mortgaged the premises to E. F. Denechaud, the instrument reciting that it was given "to secure a note for two thousand dollars, made by Mrs. Berrey and her husband, payable six months after date." It is alleged in the bill that this mortgage was given to secure a note executed by complainant and her husband to said Denechaud for money loaned her husband, and debts then due by him to Denechaud, and "that no part of the money or other consideration of the note was ever used or received by complainant."

Denechaud transferred the mortgage, shortly after maturity of the note, to A. Del Trigo, a citizen of New Orleans, La., reciting in the transfer that he had taken the mortgage as Del Trigo's agent. In May, 1868, the debt not having been paid, Del Trigo, in pursance of the power contained in the mortgage, sold and conveyed the premises to Juniata Denechaud, his daughter, and the wife of said E. F. Denechaud, who, with her said husband, entered into possession by a tenant, and have ever since so continued. The value of the yearly rental of the premises was alleged to be five hundred dollars.

John Berrey, Del Trigo, E. F. Denechaud, and Juniata, his wife, were parties defendant, and the prayer of the bill is, that the mortgage and sale under it be declared void; that the note, mortgage and conveyance at the mortgage sale be delivered up for cancellation; that complainant have possession of the premises restored to her; and that the defendants be decreed to account to her for the rents, revenues and profits of the premises since the sale and their possession under it, and for general relief.

There was a decree *pro confesso* as to Berrey. The other defendants answered, and also demurred to the bill; the

principal ground of demurrer being that the deed from
Herbert to complainant showed that she had such an estate
in the premises as could be conveyed by mortgage, &c.;
and, 2d, that it did not sufficiently appear that the money
for which the note was given, was not furnished at com-
plainant's request, to be invested for her use, whether so
used or not.   3d. For want of equity.

Denechaud and wife, in their answer, which was sworn
to, (oath not having been waived,) admit complainant's
marriage with Berrey as stated, the conveyance to her by
Herbert, the execution of the note and mortgage, and the
sale under it, and purchase and possession by Juniata Den-
echaud; but state that the sole consideration of the note
was money parted with at the time by Denechaud for the
use of Mrs. Berrey, complainant, and at her request handed
her husband, John; and that this was the sole considera-
tion for the note and mortgage; that the money thus loaned
belonged to Del Trigo, whose agent Denechaud was in the
transaction in loaning it out, &c.; that the rental value of
the premises was much less than five hundred dollars per
annum, and that they had spent large sums for taxes, in-
surance, and improvements on the buildings since their
purchase.

Del Trigo's answer, which was also sworn to, was the
same in substance as that of the Denechauds.   At the sale
made under the power of sale given in the mortgage, he
furnished his daughter the money to purchase, &c., by pay-
ing to himself the amount of the mortgage debt, and caus-
ing a deed to be made to her sole and separate use, &c.

All the respondents deny that the land purchased from
Herbert was purchased by complainant's brother, or with
her money, and proof as to this was required.

Complainant was examined as a witness in her own be-
half, and she also took the depositions of her father, Hiram
Carver, her husband, John Berrey, and of one John H.
Bostwick.   The respondents examined Major Henry St.
Paul.

It is not clear, from the testimony, with whose money

the house and lot were originally purchased, but it is shown that it was not purchased with complainant's money, and the preponderance of the testimony went to show that it was made with John Berrey's money.

Berrey was notoriously insolvent, and reckless in his habits, dissipated and a spendthrift, and had been for some time out of employment when the loan was made.

Bostwick testified, that he heard of Denechaud's having money to lend, and as Berrey owed a firm of which Bostwick was a member, he felt interested, and informed Berrey, who called on Denechaud, and was told to take the deeds to St. Paul, Denechaud's attorney and legal adviser, for examination.

St. Paul testified, among other things, that he was called on at his office by John C. Berrey, who told him about the intended loan to his wife, "Mrs. Berrey," and that Denechaud wanted witness to look into Mrs. Berrey's title deeds; that "Berrey was very pressing; and when the deed was ready, one or two days afterwards, he wanted me to let him have it and he would have it signed by his wife. I told him that this was impossible, and that before anything was done, I had to see his wife myself, and ascertain, apart from him, whether the loan was really desired by her, and for her own benefit. Berrey said she should tell me all about it herself; that she knew he was not lucky in business, and that she wanted to support her children by working in her own name, and as a partner with a gentleman whom he named, (the same that afterwards signed the deed with me as a witness,) John H. Bostwick."

In his testimony, St. Paul further states, that he called at Mrs. Berrey's residence and saw her privately. She told him that she "wanted the money to go into partnership with a gentleman to make a support for herself and her children, who were in want." The nature of the mortgage was fully explained to her by St. Paul.

Bostwick stated that he might have said something about using the surplus of money, after paying Berrey's debts, for the use of the family, but denied having said so to Mrs.

Berrey, or her knowing anything about it. St. Paul testified directly the opposite.

Mrs. Berrey, in her testimony, denies having the conversation with St. Paul, as stated.

The proof was conflicting as to whether the note was given to secure any other debt than that growing out of the loan. Berrey and the other witnesses for complainant testified that Berrey spent the money obtained on said note (usurious interest on which, was deducted in advance from the amount called for on the face of the note,) in paying his own debts. Mrs. Berrey denied positively having received any benefit from it. The proof showed that some of the money loaned went to the payment of taxes on the property, &c.

The demurrer having been overruled at a former term, the cause was submitted for final decree on bill and exhibits, answers of the defendants and decree *pro confesso* against Berrey, agreement of counsel, and testimony.

The chancellor decreed that the complainant was entitled to the relief prayed; that the mortgage and note, and the conveyance under the mortgage sale, be delivered up and marked cancelled, and filed with the papers in the cause, and held for naught. A reference was also ordered, to take an account of the amount due for rent of the land while in possession of Juniata Denechaud.

The defendants appeal, and here assign for error, among other things—

1st. Overruling the demurrer.

2d. The decree rendered.

3d. In decreeing a reference to register to take an account of rent, without regard to improvements made on the place, taxes paid, &c.

4. In ordering the note to be cancelled, although signed by John Berrey as well as his wife, and as to him at least being valid and supported by a sufficient consideration.

5. In ordering the note and mortgage to be cancelled, and in decreeing the sale under it void.

A. R. Manning, for appellant—Recapitulated and criticised the testimony, contending that it showed that there was a conspiracy between John C. Berry and Bostwick, by means of false representations, to get this money from Denechaud, for their own use, upon a mortgage of the property of Mrs. Berrey; although thereby they put her in imminent and almost unavoidable peril of being driven with her children from the only home and shelter she possessed; and that she was induced to co-operate with them. Whether she did so voluntarily or only under their pressing influence, can make no difference so far as the rights of Mrs. Denechaud are concerned.—*Sheppard v. Shœffer*, January term, 1871.

II. He also contended, that under the evidence the mortgaged premises were not the separate statutory estate of complainant. The deed of the property to plaintiff was made in 1865; and the mortgage, executed by herself and her husband jointly, was made in September, 1867, before the constitution of that year was framed. The cause is, therefore, not affected by section 6 of article 14 of that constitution. If that section is to be literally construed, and all the property of a married woman must "be and *remain* the separate estate of such female," and may be only "*devised or bequeathed* by her," and not conveyed or alienated during her life and marriage, she might be rich in unimproved and unproductive real estate, and yet starve, because unable to sell any of it in order to improve the rest, or to raise money by which to feed herself and children. But that constitutional provision does not affect this cause.

1. In the second paragraph of her bill, plaintiff says that the mortgaged land "was conveyed by John H. Herbert and wife, to the *sole and separate use* of your oratrix." And the deed, to which she refers, and which is exhibited, does convey it to her for her sole and separate use. This is a "separate estate in its broadest sense;" by contract, by the conveyance through which she acquired it.—*Ozley v. Ikelheimer*, 26 Ala. R. 332; *Oliver v. Friend*, 27 Ala. 532;

*Caldwell v. Pickens, Adm'r*, 39 Ala. 514; *Cuthbert v. Wolfe,* 19 Ala. 376; *Cannon v. Turner*, 32 Ala. 483.

And it has been so repeatedly held, and the supreme court, in *Cannon v. Turner, (supra,)* said: "After the most careful consideration, we decided, in *Pickens and Wife v. Oliver*, (29 Ala. 528,) that the provisions of article 3, chapter 1, title 5, part 2, of the Code, relate to and provide for estates of married women which are made separate by operation of law; estates created by descent, gift, or in some other manner, without words, which would have created a separate estate, before our statute on the subject; and not to estates which, independent of legislation, would have been separate by the operation of the instrument or contract creating them." The court then refers to several other cases in which it was so held.—32 Ala. 485.

And it makes no difference whether the "instrument or contract creating" the separate estate was executed before or after the adoption of the Code. This very point arose in that case of *Cannon v. Turner;* and the court say that, held otherwise, "we must make an arbitrary and senseless discrimination in the effect of the same words, when applied to instruments of different dates."—*Ib.*

The learned judge might have added, moreover, that if by the act of 1850, or by the Code, the legislature intended to abolish for the future, the long known and well established separate estates of married women, which had for hundreds of years been the subject of equity jurisdiction, it would certainly have done so in express terms. It was not, in those enactments, dealing at all with these estates. On the contrary, it was dealing with the estates (and those estates only) which husbands got by marriage in the property of their wives, respectively, when not secured to the latter as their separate property by contract, or the instruments conveying it. The common-law rights of the husband in such property of the wife were restrained and changed by statute, and thenceforth such property became the *statutory* separate estate of the wife, to be disposed of only as the statute prescribed or authorized. "It is to be

presumed, as a general rule, that if it is the purpose of the general assembly to overturn a whole system of legislation upon a distinct and important interest of the State, and abandon it, it will be done by some direct and positive measure, and not by indirection or implication."—By PE-TERS, J., in *Horton, judge, &c., v. Mobile School Commissioners*, 43 Ala. 604.

Not only did the legislature not interfere with the separate estates of married women, or the existing laws relating to them, but the able and thoughtful men in it must have considered that, in numberless instances, it would be best that the old equity doctrine concerning such separate estates should continue in force; and that the person from whom property might come to a married woman should have power to prescribe, by the terms of the deed, whether it should or not be to her "a separate estate in the broadest sense," to use the language of the court in *Warfield v. Ravesies and Wife*, (38 Ala. 523.)

By the law relating to the "statutory separate," the rents, income and profits may be disposed of by the husband without liability to account therefor to the "wife, her heirs, or legal representatives."—Rev. Code, § 2372. Might not a father or brother naturally prefer to make a gift to his daughter or sister according to the old law, by which the rents, income and profits would belong to her, to be disposed of as she should desire? Many a woman has more prudence and strength of character than her husband. Why should not her kindred, knowing this, have a right to entrust to her control property intended for her benefit? Having such right, why should not a deed, made in the old and long approved form for that purpose, be the proper mode of exercising the right?

Furthermore, if a married woman, having a statutory separate estate, " die intestate, leaving a husband living, he is entitled to one-half of the personalty of such estate absolutely, and to the use of the realty during life;" the whole of the realty.—Rev. Code, § 2379. And this, though she may leave half a dozen children by a former husband,

and none by the husband surviving her; and this, whether the husband had reduced the property into possession during the coverture or not.—*Marshall v. Crowe's Adm'r*, 29 Ala. 278. As wills are generally put off to a time when death seems to be approaching, it is easy then for a husband, without its being known, to prevent his feeble wife from making one. But property conveyed to the wife by a deed like the one now under consideration, according to the doctrine heretofore always taught in respect to such instruments, would not, on her death without a will, pass to her husband in exclusion of her children.—*Willis v. Cadenhead*, 28 Ala. 472.

It was, therefore, well held, as it has been repeatedly by the supreme court, that the law in relation to "separate estate of a wife, in its broadest sense," was not abrogated or impaired by the acts of 1848 and 1850, or by the Code. The courts might not be so astute afterwards, to interpret doubtful words so as to create a separate estate by contract.—*Carrington & Co. v. Manning's Heirs*, 13 Ala. 625–6. But when such estate is created, the courts will recognize and uphold it.

2. It is hardly necessary to add, that a wife having such a separate estate may charge it by mortgage or otherwise, even for the debt of another.—*Ozley v. Ikelheimer*, 26 Ala. 332; *Gunter v. Williams and Wife*, 40 Ala. 561; *Molton v. Martin*, 43 Ala. 654.

3. As the decisions on this subject constitute rules in regard to title to property, which have since been acted on, they ought not now to be overruled if they were erroneous. This has been often held in Alabama; and in the great case of *The Propeller Gennessee Chief v. Fitzhugh*, (11 How. 448,) in which the supreme court of the United States reviewed and overturned its former decision in the case of *The Thomas Jefferson,* and in other cases, concerning the extent of the admiralty jurisdiction, that court says: "The case of *The Thomas Jefferson* did not decide any question of *property*, or lay down any rule by which the right of property should be determined. If it had, we should have

felt ourselves bound to follow it, notwithstanding the opinion we have expressed" [that it was erroneous]. "For every one would suppose that after the decision of this court in a matter of that kind, he might safely enter into contracts on the faith that rights thus acquired would not be disturbed. In such a case, *stare decisis* is the safe and established rule of judicial policy, and should always be adhered to. For, if the law as pronounced by the court ought not to stand, it is in the power of the legislature to amend it, without impairing rights acquired under it."

This is the wise doctrine of the highest court in this land, or perhaps in the world. And it must be the doctrine of all courts that will not suffer themselves to be used as traps for the ruin of those who put trust in them.

Who can tell how many prudent men have taken conveyances and mortgages, and how many learned lawyers have advised the taking of them, in the faith that what the supreme court of Alabama had decided in respect to such deeds as that to Mrs. Berrey, the same court would continue to hold until the legislature should change the law for the future?

4. It is not to be forgotten that the Code, without change so far as this cause is concerned, has been adopted with a knowledge on the part of the legislature of the interpretation given by the courts of the portions under consideration. And such re-enactment is a re-enactment with that interpretation.—*Duramus v. Harrison*, 26 Ala. 326; also, 29 Ala. 355.

5. Plaintiff's counsel predicate the right to a decree on the late cases of *Bibb v. Pope*, (43 Ala. 190,) and *Molton v. Martin, ib.* 651.

In the former, Judge PETERS takes pains to show that by the *conveyance* to Mrs. Pope no "separate estate" was created; but that a *statutory* separate estate in her was created by the Code; and that the only question was "whether her statutory separate estate was liable to be sold" under the mortgage which she signed jointly with her husband, to secure payment of the debt of the hus-

Denechaud et al. v. Berrey.

band. "This question" (he adds) "has not heretofore been settled by any decision of this court."—Pp. 197–8.

And the court correctly decides that the mortgage (which the mortgagee knew was taken to pay a debt of the husband) was not valid. The decision is not only not opposed to any other of the supreme court, but is in harmony with some of them.

In *Warfield v. Ravesies and Wife*, (38 Ala. 523,) the supreme court held that the act of 1850, incorporated in the Code, in respect to property of married women, and giving to them a power of disposition, was an enabling statute; and that the power conferred must be exercised only in the mode prescribed by the statute. Therefore, by simply signing a note with her husband for the payment of money, the wife did not charge her statutory separate estate. A deed of it must be duly executed.

So, as the law makes the proceeds of a sale of the property, like the property itself, the separate estate of the wife, to be invested or employed for her benefit, (and it is only for this purpose that a sale of the property is authorized to be made,) a person who should take a deed of sale, however correct in *form*, to himself, of the statutory separate estate of the wife, in payment of a debt of the husband to him, or for a price which he knew was to be appropriated by the husband to his own use, would not get a good title. The enabling statute did not authorize a sale to be made for that purpose. This is the principle on which the decision in *Bibb v. Pope* is really and expressly founded, and not on the fact that the deed was a mortgage deed instead of a deed of absolute sale.

The power to sell, to raise money to be invested for the benefit of the wife, confers the power to mortgage for the same purpose.

In the case of *Bell v. Harris*, (4 Myl. & Cr. 264,) on appeal from the vice-chancellor, Lord Chancellor Cottenham, affirming his decree, says, (pp. 267–8): "The third point is equally untenable, viz., that the right of the trustee to sell did not authorize the mortgage. So long ago as the case

of *Mills v. Banks*, in 1724, (3 P. W. 1,) it seems to have been assumed as settled that 'a power to sell implies a power to mortgage, which is a conditional sale'; and no case has been cited throwing any doubt upon that proposition."

Much more should that be so where trustee and *cestui que trust* join in the deed of mortgage, and it is made for the benefit, as prescribed, of the *cestui que trust.*

There is nothing in *Bibb v. Pope* (which relates, as we have seen, exclusively to a statutory separate estate,) adverse to the defendants in this cause.

Nor does the case of *Molton v. Martin*, (43 Ala. 651,) affect this cause. Notwithstanding some ambiguity in the language of the judge, the court held only that property bought with the proceeds of the statutory estate of a married woman, became also her statutory separate estate, although the deed conveying it to her expressed that it was for her sole and separate use; because the husband and wife can not convert her statutory separate estate into a separate estate by contract. Compare opinion with the argument of appellant, p. 653.

In this cause, the property of Mrs. Berrey was not bought with money of her statutory separate estate. She herself so testifies (on her first cross-examination): "Mr. Berrey bargained for the place and bought it. Mr. Berrey procured the deed to be made. I do not know who wrote the deed. The place *was paid for by Mr. Berrey with his money.* My brother accepted the drafts which were given in payment of the place, and paid them." And although, after this, Mr. Berrey is examined by plaintiff as a witness, her testimony remains unchanged, that the property was not bought with her money, but with his. It looks, indeed, as if the property was subject to the liabilities of the insolvent Mr. Berrey, without any act to be done by him or his wife, and might be properly sold to discharge them. It is wholly immaterial, however, whose money paid for the property, if Mrs. Berrey's did not. Whether paid for by the money of Mr. Berrey, (as she testifies,) or of her brother, (as al-

leged in the bill of complaint,) is a circumstance which does not affect the construction or operation of the deed.

In any aspect of this cause, it would seem that the bill of plaintiff must be dismissed, unless it be held that the husband and wife may profit by deceiving those with whom they deal, and the decisions of the highest court of the State, constituting rules of property, are to be recklessly overturned.

III. If the appellees (plaintiffs below) were entitled to a decree, it would still be error to require the promissory note to be delivered up and cancelled; for John C. Berrey would continue liable upon it.

IV. Nor would she be entitled to full rent, without abatement for needed repairs, for taxes paid, and for other expenses.

BEN LANE POSEY, contra.

[No brief on file.]

PETERS, J.—The question of primary importance in this cause, is the title of Mrs. Berrey to the property in dispute. If it is a separate estate, governed by the statute securing to married women their separate property, then the difficulty is easily solved; but if it is an estate held by some other tenure, which frees it from the limitations o the statute, then a different rule of law must apply.

Mrs. Berrey is a married woman and a citizen of this State, and her husband is still living. She was married in 1849. The land in controversy was conveyed to her "for her sole and separate use and benefit," on the 12th day of August, 1865, by deed of that date. This land is situated in this State, and the deed to her purports to have been made in this State. Her property in it has, therefore, accrued since the passage of the statutes digested in the Code, regulating the estate of the wife. The Code went into operation on the 17th day of January, 1853.—Pamph. Acts 1853–54, p. 87. The first enactment upon the subject of "securing to married women their separate estates," in

this State, was approved on the 1st of March, 1848. The first section of this act shows very clearly the legislative purpose. It is in these words: "That if any married woman, before and at the time of marriage, shall *have* and *own any property or estate*, whether the same be real, personal or mixed, in possession, remainder or reversion, or if *any such estate* shall, after marriage, by descent, gift, demise, or otherwise, accrue to any woman, *all such estate and property* shall be taken, held and esteemed in law as the *separate estate* of such woman; and no husband shall, by his marriage, acquire a right to the property which his wife had upon his marriage, or which she may after acquire by descent, gift, demise, or otherwise, except as is hereafter provided for."—Pamph. Acts 1847–48, p. 79, No. 23. This language was copied into the first section of the act of the general assembly of this State, entitled "An act to alter and amend the act *securing* to married women their separate estates, and for other purposes, approved March 1st, 1848," which amendatory act was approved February 13, 1850.—Pamph. Acts 1849–50, page 63, No. 23, § 1. These two sections of these two important statutes are identically the same in language, as will be seen on comparison. The act of February 13, 1850, repealed all laws and parts of laws in conflict with its provisions.—Section 11. The language of the first section of this latter act is condensed in the Code of Alabama in the following terms: "ALL PROPERTY of the wife, *held* by her previous to the marriage, or *which she may become entitled to* after the marriage, *in any manner*, is the *separate estate* of the wife, and is not subject to the payment of the debts of the husband."—Rev. Code, § 2371; Code of Alabama, § 1872. This language is but a synopsis and condensed statement of the section of the act last above referred to. The words "*all property*" take the place of the words "*all such estate and property*," used in the original act and the amended act. These words are as broad as the language can make them. They include every thing that can be owned.—*Jackson v. Housel*, 17 John. 281, 283, (marg.); *Morrison v. Semple*, 6 Binn. 94; *Doe, ex*

Denechaud et al. v. Berrey.

*dem. Ward, v. Langland,* 14 East, 370; *Soulard v. United States,* 4 Pet. 511; *Jackson v. Robins,* 16 John. 537, 587, (marg.); *Lambert's Lessee v. Paine,* 3 Cres. 97, 128. And the words "in any manner" refer to the title; that is, to the manner of the holding, and the manner of becoming entitled to the property. "In any manner," in such a connection, means "in every manner." It includes every possible title upon which a claim to property can be supported. Wherever the wife had a right of property, or became entitled to a right of property, the statute intended to "secure" it to her, "as her separate estate," under "the provisions" of the Code.—Rev. Code, §§ 2382, 2388. There can be no doubt of the legislative authority to pass such a law in relation to all future acquisitions of the wife. That is the case here. The property in controversy has been acquired by the wife since the promulgation of the Code; and it is *held* under that system. Since the Code, the words creating a separate property in the wife are mere surplusage. This would be the effect of the deed without such words. They do not add to the force of the title, and they can not vary the wife's rights under the law. The law enters into the title and controls it, where the title *in any manner* passes to *her,* in her own name. To me, the language and purpose of the statute is clear and free from doubt. And I have reluctantly yielded my assent to the conclusion, that it does not govern all estates in which the wife has an interest, to the extent of her "estate," at least, whether the property be conveyed directly to her, in her own name, or to a trustee for her use. Her rights of property in the one instance, as well as the other, need to be "secured" and protected. The law for this purpose covers *all her* property. And her property in this State is not to be condemned for her husband's debts. As a married woman, she holds all her estate and property "subject to all the rules, regulations and limitations" contained in the Code, after that system of law went into operation.—Rev. Code, §§ 2382, 2388. That this statute is free from constitutional objection, I think has never been doubted. Our

statute has existed for above twenty-three years, and it has never been assailed as wanting in constitutional validity, in any case known to me. Such laws are now common in almost, if not quite, all the States of the Union; and the legislative power to pass them is every where admitted, so far as future acquisitions are concerned.—1 Kent, 455; *Nerrill v. Sherburne*, 1 N. H. 213; Smith on Stat. and Con. Constr. 412; Cooley on Const. Law, 360, 361, ed. of 1868; *Glenn v. Glenn*, January term, 1872; *Moulton v. Martin*, 43 Ala. 651. This exposition of the law governing the separate estate of the wife necessarily brings the estate of Mrs. Berrey in the lands in controversy in this suit under its provisions. In this view of the case, she could not bind herself by the mortgage, either for her husband's or her own debt, contracted since the Code was promulgated, in the manner that has been attempted in this case.— *Wilkinson et al. v. Cheatham et al.*, 45 Ala. R. 337; *Bibb v. Pope*, 43 Ala. 190; *Warfield v. Ravesies and Wife*, 38 Ala. 518.

The decree of the learned chancellor in the court below was, therefore, correct, and it must be sustained.

The decree of the court below is affirmed, and the appellants will pay the costs of this appeal in this court and in the court below.

NOTE BY REPORTER.—At a subsequent day of the term, appellant applied for a rehearing, and filed in support thereof the following argument:

Motion is made for a rehearing in this cause, on two points which have not been the subject of consideration by the court.

The record shows that John C. Berrey, the insolvent husband of Mrs. Berrey, (and who certainly did, if Mrs. Berrey did not, get the money of Mrs. Denechaud,) himself bought and caused to be paid for out of his own money, the land in controversy, which he procured to be conveyed by Herbert and wife to Mrs. Berrey, and which Berrey and wife mortgaged to Denechaud to secure the repayment of that money.

Mrs. Berrey herself says in her first deposition, "I did not obtain the money with which the land spoken of * * * was bought. * * It was not bought with my money. The money was not given to me at all. It did not pass through my hands; but the place was bought by Mr. Berrey and deeded to me."

And in reply to first interrogatory at same time, Mrs. Berrey says: "Mr. Berrey bargained for the place and bought it. Mr. Berrey procured the deed to be made. The place was paid for by Mr. Berrey, and *with his money*. My brother accepted the drafts which were given in payment for the place, and paid them;" but, as she says, with Mr. Berrey's money.

This testimony was given in presence of her father, who was examined at the same time, and on the same interrogatories and cross-interrogatories, each alternately, first on the former, and then on the latter; and although her husband and she again, several months afterwards, were examined, no contrary evidence was given; and there is no pretense that this evidence is not correct. Now, the *money of this insolvent man being invested in this land*, and it being mortgaged by both husband and wife to secure the payment of the money borrowed by both upon a note signed by both, will not the court require those who seek equity also to do equity? Will a court of equity actively aid them to get back the land, except upon the condition that they will pay back the money they received, and the taxes and cost of repairs? To require them to do this, in favor of the unfortunate Mrs. Denechaud, who is now left almost penniless, does not interfere with the point chiefly established by the court, but requires the plaintiff to do equity on the condition of receiving the aid of the court.—1 Story's Eq. Jur. § 64e.

2. The decree of the chancellor affirmed by this court directs that the note signed by Berrey himself, as well as by his wife, shall be cancelled and delivered up; and so that no recourse shall be had against John C. Berrey even. This surely can not be intended by the court.

Again, Mrs. Denechaud has been paying taxes, insurance, cost of repairs, &c., as set forth in the answers; yet, the decree referring it to the master for an account of the rents, does not instruct or authorize the register to make any allowance for these things.

At the succeeding term, the application was denied.